UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BEACON ASSOCIATES MANAGEMENT CORP.,    :

                Plaintiff,    :

        -against-    :    09 Civ. 6910 (AJP)

BEACON ASSOCIATES LLC I,    :    **OPINION AND ORDER**

             Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

        Beacon Associates LLC I ("Beacon" or the "Fund"), is a private investment fund decimated by the Ponzi scheme perpetrated by Bernard L. Madoff.  (Dkt. No. 1: Compl. ¶ 1.) Plaintiff Beacon Associates Management Corp. ("Management") is the Managing Member of Beacon and brings this action, pursuant to 28 U.S.C. § 2201, seeking a declaratory judgment that it distribute the Fund's remaining assets, and that

> in making such distribution, the current value of the capital accounts of each of Beacon's members should be calculated based on the positive balances reflected on Beacon's books as of December 11, 2008, as adjusted by the allocation to each member of their respective distributive share of Beacon's [Madoff] theft loss.

(Compl. ¶¶ 1-4, 23, 43 & Wherefore Clause.)

        Presently before the Court is the motion of David Fastenberg and 161 other intervening Fund members (the "Fastenberg Intervenors"), seeking a mandatory injunction compelling Management to distribute Beacon's remaining assets "proportionately in accordance with

the capital accounts of the investors less a write-down for the Madoff theft losses *on the date of the discovery of those losses*."   (Dkt. No. 24: Notice of Motion; Dkt. No. 25: Fastenberg Br. at 2; Dkt. No. 18: Fastenberg Intervenor Compl. ¶¶ 5, 31 & Wherefore ¶ 2.)  The parties have consented to decision of this motion by a Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Dkt. Nos. 21, 48 & 49.)[1/]

> For the reasons set forth below, the Fastenberg Intervenors' motion is <u>GRANTED</u>, and Management is directed to distribute Beacon's assets (less certain hold-backs identified below) by August 31, 2010 to Beacon's members using the Valuation Method.

## <u>FACTS</u>

### <u>The Beacon Fund</u>

> Beacon is a New York limited liability company, formed in 1995 and comprised of numerous entities and individuals who each own a membership interest in the Fund.  (Dkt. No. 1: Compl. ¶ 6; Dkt. No. 25: Fastenberg Br. at 3.)  At all times relevant to this case, Beacon's affairs, including the relationship between and among its members, were governed by the terms of the Amended and Restated Operating Agreement,[2/] dated as of April 1, 2004 (Operating Agmt.), as

---

[1/]   In order to reach a prompt resolution in this matter, the parties agreed to have the Court base its decision upon all pleadings, briefs, submissions and the oral arguments of the motion. (Dkt. No. 53: 5/20/10 Hearing Transcript ("H.") 1-8.)

[2/]   Beacon Associates LLC I and Beacon Associates LLC II, a corporate member of Beacon Associates LLC I, have separate, but virtually identical operating agreements.  (<u>Compare</u> Compl. Ex. A: Beacon I Operating Agmt., <u>with</u> Dkt. No. 40: 5/4/10 Jakoby Aff. Ex. G: Beacon II Operating Agmt.)

modified by a Confidential Offering Memorandum dated August 9, 2004 (Dkt. No. 51: Jordan

Intervenor Compl. Ex. 1: Offering Mem.) and a Supplemental Confidential Offering Memorandum

dated November 28, 2005 (Compl. Ex. A: Supp. Offering Mem.) (collectively, "the Agreement").

Beacon's stated purpose was to invest member capital in "securities and financial instruments of

every kind and description," including other investment funds.  (Compl. ¶ 6; Operating Agmt. Art.

III ¶ 1; Offering Mem. at 1-2, 25; Fastenberg Br. at 3.)

    To become a member of Beacon required an initial "Capital Contribution" exceeding

$500,000, "unless the Managing Member, in its discretion, determine[d] that a lower amount is

acceptable." (Offering Mem. at 4, 30; Operating Agmt. Art. VIII ¶ 1.)[3/]  Once accepted, members

were assigned a "Capital Account" that was "equal to [their] proportionate share of the Net Worth

of the Company."  (Offering Mem. at 34-35; Operating Agmt. Art. VIII ¶ 2.)[4/]  Capital accounts

were:

> increased by (1) the amount of any Money . . . contributed by the Member to the
> capital of the Company, and (2) the Member's share of Net Profits . . . . [and are]
> decreased by (1) the amount of any Money actually distributed by the Company to
> the Member, (2) the fair market value of any non-cash [p]roperty distributed to the
> Member . . . , and (3) the Member's share of Net Losses . . . .

(Operating Agmt. Art. VIII ¶ 2.)

---

[3/]  If accepted, subscribers are "admitted to the Company [i.e., Beacon] as a Member on the first
day of a month, or at such other time as the Managing Member, in its discretion, may
determine."  (Offering Mem. at 4.)

[4/]  Beacon's net worth includes "all cash and cash equivalents . . . , accrued interest and the
market value of all securities and other assets of" Beacon.  (Offering Mem. at 35.)

Member capital was pooled together and invested at the Managing Member's discretion.  (Operating Agmt. Art. VII ¶ 6 & Art. III ¶ 1; Offering Mem. at 1, 5, 30.)  Funds not immediately invested in securities or other financial instruments were "deposited in a bank or money market account maintained by the Managing Member . . . in the name of and for the benefit of" Beacon.  (Operating Agmt. Art. VIII ¶ 6.3; <u>see</u> Offering Mem. at 13.)  Beacon's profits and losses are allocated among its members in accordance with each member's "Sharing Ratio," or "the proportion that [an individual member's] Capital Account bears to all other Capital Accounts on the last day of each applicable accounting period."  (Operating Agmt. Art. I ¶ 43 & Art. IX ¶ 1.1; Offering Mem. at 5, 34-35.)  Profits allocated to a member's capital account "constitute[s] an additional Capital Contribution by it to the Company."  (Operating Agmt. Art. 9 ¶ 5.1.)  Sharing Ratios are adjusted when:

> a new Member is admitted, when the Company accepts an additional Capital Contribution from an Existing Member,[5] when any Member makes a withdrawal of any part of his or its Capital Account[6] or when the Company makes a distribution to less than all the [M]embers (other than in complete liquidation of their Membership Interests).

---

[5]     Existing members are permitted to "make additional investments in $25,000 increments on the first day of any month, or in such other amounts or at such other times as the Managing Member, in its discretion, may determine."  (Offering Mem. at 4.)

[6]     Withdrawals are permitted "at the end of each calendar quarter" provided the Managing Member is given "at least 60 days' prior written notice."  (Offering Mem. at 6, 35.)

(Operating Agmt. Art. I ¶ 43; see also Offering Mem. at 35 ("Net Worth and Net Worth per Interest will be calculated as of the closing of business on the last business day of each month in each year, on each Withdrawal Date, and such other date(s) as the Managing Member determines.").)

**Beacon's Madoff Investments**

Since its inception in 1995, Beacon invested approximately seventy percent of its assets with Bernard L. Madoff Investment Securities LLC ("BLMIS").  (Dkt. No. 1: Compl. ¶ 15; Dkt. No. 25: Fastenberg Br. at 3-4.)  Between 1995 and December 2008,  BLMIS issued monthly financial statements reporting substantial gains on Beacon's investments. (Dkt. No. 18: Fastenberg Intervenor Compl. ¶ 13.)  Beacon allocated those gains to its members in proportion to each member's interest in Beacon and reflected those gains in its financial statements.  (Fastenberg Intervenor Compl. ¶¶ 12-14.)

On December 11, 2008, it was discovered that Madoff had been operating a massive "Ponzi" scheme, and that virtually all of the money invested with BLMIS was stolen.  (Compl. ¶ 19; Fastenberg Intervenor Compl. ¶ 2.)  Following Madoff's arrest, an action was commenced in the United States Bankruptcy Court for the Southern District of New York seeking liquidation of BLMIS.  (Compl. ¶ 20.)  An investigation by the Bankruptcy Court revealed that BLMIS  had not purchased or sold any securities since 1996, but rather, used investor funds in furtherance of the Ponzi scheme.  (Compl. ¶ 20.)

Beacon made its last investment with BLMIS in July 2008.  (Dkt. No. 55: Jordan Br. at 1-2; Dkt. No. 53: H. 16-19.)

**Liquidation of the Beacon Fund**

On December 18, 2008, Management advised Beacon's members that, as a result of Madoff-related losses, "Beacon was commencing with the process of liquidation."  (Dkt. No. 1: Compl. ¶ 21.)  Management consulted Beacon's accountants, Citrin Cooperman & Company, who advised of several "valuation methodologies" that could be used to determine how Beacon's remaining assets should be distributed to its members.  (Compl. ¶¶ 23-24.)

The first such method, referred to as the "Valuation Method," treats the Madoff losses as though they occurred due to "market fluctuations," that is, the Madoff-related losses are reported as having occurred in December 2008 (the date of discovery) and, pursuant to Beacon's Operating Agreement, allocated to each member on a pro-rata basis.  (Dkt. No. 26: Folkenflik Aff. Ex. D: Citrin Mem. at 1-2.)  Thus, if a member's "capital balance represented 1% of the fund as of December 1, 2008 . . . , that [member] would be allocated 1% of the losses attributable to Madoff." (Citrin Mem. at 1-2.)  Similarly, members who were "fully redeemed from the fund prior to December 1, 2008 were not allocated any losses." (Citrin Mem. at 2.)

An alternative methodology, referred to as the "Restatement Method," treats the Madoff losses as having occurred in the same month that each of Beacon's investments in BLMIS were made:

> For instance, if the Fund invested $100,000 into Madoff in May 2005, then [the] restatement method will consider that $100,000 lost in May 2005, and allocate the $100,000 loss to each partner's capital account in the ratio which the capital account of such partner bears to the total of the capital accounts of all partners.

(Citrin Mem. at 2.)  Thus, all "profits" made from the Madoff investments would be eliminated and each member's capital account balance recalculated to reflect the historical losses.  (Citrin Mem. at 2.)  Using this methodology, each member's capital account balance would become "negative upon full redemption of their capital balances. . . .[and] many [members]' balances [would] become negative with partial redemptions."  (Citrin Mem. at 3.)  As this methodology contemplates that certain members withdrew more than they were entitled to, any loss resulting from negative balances would need to be "clawed-back" from the divested members or, alternatively, allocated among Beacon's remaining members.  (Citrin Mem. at 3.)[7]

> Based on Citrin's advice, Management concluded that
>
> the method most consistent with Beacon's past practices and the terms of the [Operating] Agreement would employ the positive balances in the members' respective Capital Accounts as actually reflected on the books of Beacon as of December 11, 2008, and would adjust these balances based on an allocation to each member of their respective distributive share of Beacon's theft loss . . . .

---

[7]  Because Beacon periodically withdrew funds from BLMIS, three variants of the Restatement Method were considered to allocate the "Madoff Income."  (Citrin Mem. at 4.)  In the first Restatement variation, Madoff income is allocated to those members who had previously suffered Madoff losses.  (Citrin Mem. at 4.)  Thus, "if an investor received 10% of the Madoff Losses through the date of the first Madoff Income, then 10%, of the Madoff Income [w]ould be allocated to that [member]."  (Citrin Mem. at 4.)  Alternatively, in the second variation, Madoff income is allocated to members "in the ratio which the capital account of such [member] bears to the total of the capital accounts of all [members], regardless of whether the investor had previously suffered Madoff Losses."  (Citrin Mem. at 4.)  Finally, in the third variation, any income is first allocated to members with negative account balances, and then to other members on a pro-rata basis.  (Citrin Mem. at 5.)

(Compl. ¶ 23.)  Management also solicited an opinion from the law firm of Roberts & Holland regarding the proper methodology for determining capital account balances.  (Compl. ¶ 25.) Roberts & Holland's opinion letter dated May 27, 2009 advised that

> the most reasonable reading of the [Operating] Agreement is that distributions in liquidation of Beacon should be made in proportion to the positive balances in the members' respective Capital Accounts, as actually reflected on the books of Beacon at December 11, 2008, and as further adjusted for the allocation to them, in accordance with such balances on that date, of their respective distributive shares of Beacon's theft loss deduction computed in accordance with the principles of Revenue Ruling 2009-9 and Revenue Procedure 2009-20 (and other items of income, gain, loss, and deduction from and after that date).

(Compl. Ex. B: Roberts & Holland Op. Ltr. at 5.)  Roberts & Holland further advised, however, that "notwithstanding [their] conclusion, . . . there is a risk that a court might conclude that distributions made in the manner set forth above did not comport with the members' respective rights" and that each member's account balance must be restated for each prior period to account for the Madoff loss as it occurred, not when it was discovered.  (Roberts & Holland Op. Ltr. at 5-6.)

As a result of the Roberts & Holland opinion letter, Management directed Citrin to calculate each member's capital account balance using the Valuation and Restatement methodologies. (Compl. ¶ 28.)  Not surprisingly, the different methodologies "provided dramatically different results."  (Compl. ¶ 28.)  By way of illustration, while the capital account of one member was calculated at $4,750,866 using the Valuation method, it had a balance of $2,735,636 under a Restatement method.  (Compl. ¶ 29.)  Conversely, another member's capital account was valued at

$1,815,576 under the Valuation method, but exceeded $3,000,000 under a Restatement method.

(Compl. ¶ 29.)[8]

> Beacon's counsel informed Management that it
>
> question[ed] Management's ability to make distributions which would result in preferential treatment of one class of investors verses another, and that, in the absence of a full consensus of Beacon investors (which Fund Counsel acknowledges is not feasible) or a Court Order, Management will be held accountable for any injury suffered by investors as a result of improper distribution.

(Compl. ¶¶ 2, 36.)

> Because Management's selection of "one valuation methodology over another" would

invariably favor one class of members over another, any decision it made likely would create "extensive, resource-depleting and time-consuming litigation." (Compl. ¶¶ 33, 40.)  Moreover, if Management's selection ultimately was deemed incorrect, "Fund members who received a distribution in excess of their allocable share would be required to return funds distributed to them. . . . result[ing] in additional, protracted litigation . . ." (Compl. ¶ 41.)  Accordingly, Management decided that an "'independent determination as to the appropriate method of distribution'" was required.  (Compl. ¶ 35.)

---

[8]   Members invested in the Fund for long periods of time tend to benefit from the Valuation method while members who invested more recently tend to benefit from the Restatement method.  This result is owing to the fact that longtime members' capital account balances were increased by the accumulation of purported Madoff profits, while newer members' account balances were not similarly benefitted.

On September 25, 2009, Citrin issued audited financial statements for Beacon for the period January 1, 2008 through December 31, 2008.  (Folkenflik Aff. Ex. B: Beacon Fin. Stmts.)[9] According to those statements, Beacon lost approximately $358,000,000 through investments with BLMIS, and had just $113,283,785 of remaining assets.  (Beacon Fin. Stmts. at 2, 4.)  With regard to the Madoff-related losses, the accountants noted that because Beacon

> is unable to determine when the loss actually incurred, the amount of the loss attributable to previous reporting periods cannot be quantified.  Accordingly, the Company has recorded the entire loss of $358,710,309 in the period January 1, 2008 through December 17, 2008, and has not charged any portion of this loss to the Company's capital balances as of January 1, 2008.

(Beacon Fin. Stmts. at 10 n.5.)  Management prepared and issued Schedule K-1 forms [10] for each member, reporting partnership profits and losses for the year ended December 31, 2008.  (Dkt. No. 18: Fastenberg Intervenor Compl. ¶ 18; Dkt. No. 25: Fastenberg Br. at 6.)  In accordance with Beacon's audited financial statements, all member losses attributable to BLMIS investments were reported as having occurred in the 2008 tax year.  (Fastenberg Compl. ¶ 18; Fastenberg Br. at 6.)

**The Present Action**

On August 5, 2009, Management filed a complaint seeking a declaration that it may distribute "a significant portion of Beacon's remaining assets" and that

---

[9]   According to the independent auditor's report, the financial statements were prepared  "in conformity with accounting principles generally accepted in the United States of America."  (Beacon Fin. Stmts. at 1.)

[10]   Schedule K-1 Form 1065 is the form used to report partner profits and losses to the IRS.  See Purpose of Schedule K1, http://www.irs.gov/instructions/i1065sk1/ch01.html (last visited July 9, 2010).

in making such distribution, the current value of the capital accounts of each of Beacon's members should be calculated based on the positive balances reflected on Beacon's books as of the December 11, 2008, as adjusted by the allocation to each member of their respective distributive share of Beacon's theft loss.

(Dkt. No. 1: Compl. ¶ 43 & Wherefore Clause.)[11]

On January 6, 2010, Fastenberg intervened (Dkt. No. 18: Fastenberg Intervenor Compl.) and on March 4, 2010 filed the present motion seeking:

1.   A declaratory judgment that . . . the proper method for computation of each investor's capital accounts and 'sharing ratio' in the profits and losses of Beacon I for each year of operations of Beacon I is as follows:

(a)   for each of the years of the operation of Beacon I from 1995 through December 31, 2007, the individual member's capital accounts and pro-rata share of the net asset value of the Beacon Funds should be computed based upon the financial statements of Beacon I as originally certified for each such year by Beacon I's certified public accountants;

(b)   for the year 2008, the individual member's capital account and pro-rata share of the net asset value of Beacon I should be computed based upon the financial statements of Beacon I as certified by Beacon I's certified public accountants in their report dated September 25, 2009, which included a write-down for the losses incurred by Beacon I in investing fund assets with Bernard L. Madoff Investment Securities LLC ("BLMIS");

---

[11]   Although Management brought this action under the Declaratory Judgment Act, 28 U.S.C. § 2201, the Act itself "does not confer subject matter jurisdiction; instead, there must be an independent basis of jurisdiction before a district court may issue a declaratory judgment." Doe v. Coumo, 08 Civ. 8055, 2009 WL 3123045 at * 4 (S.D.N.Y. Sept. 29, 2009); accord, e.g., The New York Times Co. v. Gonzales, 459 F.3d 160, 165-66 (2d Cir. 2006); Correspondent Servs. Corp. v. First Equities Corp., 442 F.3d 767, 769 (2d Cir. 2006), cert. denied, 549 U.S. 1209, 127 S. Ct. 1329 (2007); Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians, 94 F.3d 747, 752 (2d Cir.1996).  Here, Management asserts jurisdiction under 28 U.S.C. §§ 1331 and 1367 because the action arises, in part, under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1101, et seq., and the relief sought "will materially impact the value of the assets of multiple plans subject to ERISA, and will impact the rights of those ERISA plans."  (Compl. ¶¶ 7, 10-11.)

> (c)  the individual member's capital accounts and pro-rata share of Net Asset Value shall be computed based upon the financial statements of Beacon I as certified by Beacon I's certified public accountants for each such year, or portion thereof.
>
> 2.  A declaratory judgment that none of the "sharing ratios" or capital accounts of any member of Beacon I for any year prior to 2008 is required to be restated to reflect the fact that BLMIS was engaged in a Ponzi scheme in those prior years, which involved the theft or other diversions of assets and fabrication of investment results in such years, but which was not discovered to have existed until December 2008.
>
> 3.  Beacon Management and Beacon I are ordered to distribute to the members of Beacon I, all of the remaining assets of the Beacon I in accordance with the computation of each member's sharing ratio and capital account computed as specified above, less any existing holdbacks as previously determined or as otherwise ordered by the Court.

(Dkt. No. 24: Fastenberg Notice of Motion ¶¶ 1-3; see also Fastenberg Intervenor Compl. ¶¶ 5, 31 & Wherefore ¶ 2, seeking a mandatory injunction.)

Beacon conducted a survey of its members to determine their preferred accounting methodology (see Dkt. No. 40: 5/4/10 Jakoby Aff. Ex. C: 1/26/10 Jakoby Ltr.; id. Ex. D: 3/5/10 Jakoby Ltr.; id. Ex. F: 3/11/10 Jakoby Ltr.).  Each member was advised of their "estimated distribution amounts under each method" (1/26/10 Jakoby Ltr. at 2; 3/5/10 Jakoby Ltr. at 2), and was given a copy of:  (1) the complaint; (2) Beacon's answer; (3) the Citrin Report; (4) the Roberts & Holland opinion letter; and (5) letters from investors "who would receive larger distributions under a restatement method, but are willing to accept the [V]aluation method in order to potentially expedite a distribution to the Beacon Fund's investors."  (1/26/10 Jakoby Ltr. at 1–4.)

Tabulation of the completed "Valuation Methodology Form[s]" revealed that, out of 329 total members, 270 (82%) preferred the Valuation Method; thirty-four (10%) preferred a Restatement Method;[12] and twenty-five (8%) did not make a selection.[13]   (6/16/10 Jacoby Ltr. at 1-2.)  If funds are allocated under the Valuation Method, members favoring that method represent approximately 69% of Beacon's assets whereas those favoring a Restatement Method represent just 10%.  (6/16/10 Jakoby Ltr. at 1-2.)   If funds are allocated using one of the various Restatement Methods, members favoring the Valuation Method represent approximately 57% of Beacon's remaining assets compared to just 16% favoring Restatement.  (6/16/10 Jakoby Ltr. at 1-3.)[14]

On May 20, 2010, this Court held a hearing to discuss the proper methodology to be adopted in distributing Beacon's remaining assets.  (Dkt. No. 53: 5/20/10 Hearing Transcript ("H").)  The Court heard impassioned testimony from several investors, including Dr. Robert  Decker (H. 8-10, 80-81), Bradley Tolkin (H. 10-11, 73-76) and Howard Siegel (H. 13-14, 34-35, 78-80), and argument from counsel for Management (H. 18-19, 58-65), Beacon (H. 6-7, 17-20, 33-37, 65-67, ),

---

[12]   Five (1.5%) chose the first Restatement Method; four (1.2%) chose the second Restatement Method; twenty-two (6.7%) chose the third Restatement Method; and three (0.9%) chose Restatement but did not specify which Restatement Method they preferred.  (Dkt. No. 59: 6/16/10 Jakoby Ltr.)

[13]   Fifteen investors (4.5%) did not respond to the survey and ten (3%) chose to abstain. (6/16/10 Jakoby Ltr.)

[14]   The ratio of members favoring the Valuation Method versus Restatement under each of the three Restatement Methods is:  (1) 57.6% to 16.2%, (2) 57.7% to 15.9% and (3) 55.7% to 17%, respectively.  (6/16/10 Jakoby Ltr.)

the Fastenberg Invervenors (H. 37-58, 67-69, 77-78), Petronella (H. 12-13, 14-15, 69-73 ) and Jordan (H. 21-34).[15/]

**The Parties' Arguments**

The Fastenberg Intervenors maintain that Beacon's Operating Agreement "[r]equires [d]istribution [b]ased [u]pon the Valuation Method." (Dkt. No. 25: Fastenberg Br. at 7.)  First, they argue, the Operating Agreement provides that Beacon's assets are to be divided in "'accordance with accounting principles consistently applied from year to year employed under the method of accounting adopted by the Company.'" (Fastenberg Br. at 9; H. 41-42.)  In issuing the 2008 financial statements, Management "determine[d] to account for the Madoff theft losses when discovered." (Fastenberg Br. at 9.)  Thus, the Fastenberg Intervenors assert, "[t]hat determination . . . should be consistently applied in the 2009 financial statements, and in the financial statements to be prepared in connection with the distribution of assets in 2010." (Fastenberg Br. at 9.)

Secondly, the Fastenberg Intervenors argue, the Agreement requires that profits and losses be allocated in conformity with "Section 704(b) of the Internal Revenue Code." (Fastenberg Br. at 9-10.)  "Since the Section 704(b) regulations require that the BLMIS loss must be recognized as of December 2008," they contend, Beacon "must distribute the remaining funds . . . on that basis." (Fastenberg Br. at 10.)

---

[15/]   The Court also received letters from several Beacon members including:  Dr. Robert E. Decker; Howard M. Siegel, CPA, JD, LLM; Ironworkers Local No. 6 Pension Fund; Ironworkers Local No. 6 Supplemental Medical and S.U.B. Pay Plan; Bradley J. Tolkin; SALI Fund Services; Holly Weisman; LJMMJ Investors, LLC; Robert Winikoff; Luana Alesio; and Howard Karawan.  (5/4/10 Jakoby Aff. Ex. E: Investor Ltrs.)

Even if Management had the authority to restate the financial statements, the Fastenberg Intervenors argue, doing so would be unfair because it would "unsettl[e] a whole series of transactions previously engaged in on the basis of [the] certified financial statements." (Fastenberg Br. at 11; H. 39-42, 54.)   In any event, they argue, accurately restating the financial statements would be impossible because no one knows "exactly what occurred when, and how [it] occurred" (H. 44; Fastenberg Br. at 13-16), and uncertainty as to when the Madoff losses actually occurred is precisely why Citrin "did not stand behind any of th[e] restatement calculations" (H. 45; Fastenberg Br. at 14-16).[16]

The Fastenberg Intervenors' motion is opposed by the Estate of P. Neill Petronella, a Beacon member since 2006.  (Dkt. No. 41: Re Aff.; Dkt No. 42: Petronella Br.)  Petronella opposes use of the Valuation Method because it "recognizes fictitious gains and unfairly requires more recent investors to give up a share of their actual dollar investment to subsidize earlier investors, whose only claim to such additional funds are the fabricated profits Madoff put on paper."  (Petronella Br. at 8.)  If the Valuation Method were adopted, Petronella argues, the only measure taken

> to reconcile the Beacon Funds investors' account with the economic reality of the fraud perpetrated by the Madoff Ponzi scheme is a single write off in late 2008; thereby, incorporating and necessarily endorsing all of the fictitious profits previously reported by BLMIS up to the December 2008 write off.

---

[16]   Beacon members Howard Siegel and Dr. Robert Decker also favor use of the Valuation Method.  According to Siegel, each of the proposed accounting "methods has pros and cons," but the Valuation Method has been employed "over the 14 or 15 years of the fund" and is the best method to provide an "expeditious" distribution.  (H. 79.)  Like Siegel, Decker prefers the Valuation Method because it was the method used throughout the life of the fund and would lead to the quickest distribution.  (H. 9-10, 80-81.)

(Petronella Br. at 6)

Instead, Petronella proposes that capital account balances be recalculated based upon an "investor's cash contributions, less withdrawals." (Petronella Br. at 1.) While recognizing that this so called "Net Investment" Method is not perfect, Petronella claims that it is preferable to the Valuation or Restatement Methods because it does not give "credence to 'profits' that everyone now knows to be a fiction." (Petronella Br. at 1.)[17] Moreover, Petronella argues, because courts routinely apply the Net Investment Method "when a Ponzi scheme collapses[] and there are insufficient assets to repay all of the investments," and because "the overwhelming majority of Beacon's funds are subject to the B[LM]IS Ponzi scheme," the Net Investment Method should be applied here. (Petronella Br. at 7-10; H. 69.)[18]

Although Beacon takes no position on the proper accounting methodology, it opposes the Fastenberg Intervenors' motion to the extent that it calls for distribution of all Beacon's remaining assets. (Dkt. No. 39: Beacon Br. at 9.) According to Beacon, a "litigation reserve of 9% was established in early 2009 and should at this time be maintained." (Beacon Br. at 9; Dkt. No. 38: Rosenfeld Aff. ¶ 9.) Also, Beacon was informed in August 2009 that the Madoff Bankruptcy Trustee

---

[17]     Similarly, investor Bradley Tolkin argues that because the only facts known, or knowable, "are cash in and cash out," the Net Investment Method is the only accounting method not based upon a "fiction." (H. 74-76; Dkt. No. 40: 5/4/10 Jakoby Aff. Ex. E: 3/11/10 Tolkin Email.)

[18]     Conversely, the Fastenberg Intervenors argue that the Net Investment Method should not be used because Beacon made real profits through non-BLMIS investments, and the Net Investment Method ignores those legitimate gains. (H. 50-51.)

is "asserting claw back claims" against Beacon totaling $28,310,000.  (Beacon Br. at 9; <u>see</u> Rosenfeld Aff. ¶ 9.)  Accordingly, Beacon requests that an appropriate amount of money be set aside in the event it is required to pay those claims.  (Beacon Br. at 9-10.)

<u>ANALYSIS</u>

## I.   THE VALUATION METHOD SHALL BE USED TO DISTRIBUTE BEACON'S REMAINING ASSETS

### A.   Beacon's Operating Agreement Mandates Use of the Valuation Method

The Fastenberg Intervenors assert that Beacon's Operating Agreement "[r]equires" that Management make distributions using the Valuation Method.  (<u>See</u> page 14 above.)  The Court agrees.

Pursuant to Article XIV of Beacon's Operating Agreement, upon dissolution, Beacon's remaining assets are to be distributed to "Members in accordance with their positive Capital Account balances taking into account all Capital Account adjustments for the Company's taxable year in which the dissolution occurs."  (Dkt. No. 1: Compl. Ex. A: Operating Agmt. Art. XIV ¶ 2.1(iii).)  As mentioned above, each member's capital account balance is "equal to [their] proportionate share of the Net Worth of" Beacon, which includes "all cash and cash equivalents . . . , accrued interest and the market value of all securities and other assets of" Beacon.  (<u>See</u> page 3 & n.4 above.)

The Operating Agreement, therefore, clearly mandates that each member's distribution equal their proportionate share of Beacon's remaining assets.  What is at issue here, however, is whether the Operating Agreement requires that each members' interest equal their capital account

balance as stated on Beacon's books as of December 2008, or whether Beacon's books should be restated to eliminate the fictitious profits reported to Beacon by BLMIS.[19]

> According to Beacon's Offering Memorandum:
>
> Net Worth and Net Worth per Interest will be calculated as of the closing of business on the last business day of each month in each year, on each Withdrawal Date, and such other date(s) as the Managing Member determines (each, a **"Valuation Date"**). Securities held by the Company are valued by the Managing Member at their fair market value as of the Valuation Date. . . . Investments in Investment Pools are valued pursuant to the valuations submitted to the Company by the Managers of the Investment Pools, which valuations the Company expects to accept. <u>All values assigned by the Managing Member are final, binding and conclusive on all of the Members.</u>

(Dkt. No. 51: Jordan Intervenor Compl. Ex. 1: Offering Mem. at 35, emphasis added.)

While this provision suggests that historical computations of member interests should not, or cannot, be disturbed, Petronella argues that the Operating Agreement, while correctly reflecting "the agreement between the investors as to profits and losses due to market fluctuations, investment risks, [and] volatility of market," is inapplicable here because "there was no agreement as to how to divvy up the remaining assets after a fraud." (Dkt. No. 53: H. 69-70.) While it is undoubtedly true that no one anticipated the extent of Madoff's fraud, the Offering Memorandum clearly states that "[t]he Managing Member relies on the Managers of Investment Pools for the valuations of these vehicles for purposes of calculating the Company's Net Asset Value," and further

---

[19]     Interestingly, although approximately 10% of Beacon's investors indicated that they preferred one of the Restatement Methods (<u>see</u> page 13 above), no party appearing before the Court has argued for its application.  Instead, the dispute before the Court is between those preferring the Valuation Method and those preferring the Net Investment (cash in less cash out) Method.  (<u>See</u> pages 14-17 above.)

warns that "[t]here is no assurance that these valuations will be accurate." (Offering Mem. at 24.)

In a section entitled "Company Risks," the Offering Memorandum is explicit:  "Although the

Managing Member endeavors to verify the integrity of its Managers and broker it utilizes, there is

always the risk that they could mishandle or convert the securities or assets under their control."

(Offering Mem. at 21-22.)

       These provision demonstrate that it was an understood risk that investment managers,

such as Madoff, might misappropriate Beacon's assets, resulting in false Beacon financial statements.

Nonetheless, the members agreed that once adopted by Management, those financial statements

would become "final, binding and conclusive on all of the members."  (Offering Mem. at 35.)

Because the financial statements upon which each member's final capital account balance is based

were adopted by Management, the Operating Agreement requires that each member's interest equal

their capital account balance as stated on Beacon's books as of December 2008.

       Moreover, as discussed in the May 27, 2009 Roberts & Holland letter (Compl. Ex.

B: Roberts & Holland Op. Ltr. at 3-6), Beacon intended "to be taxed as a partnership for federal

income tax purposes" (Offering Mem. at 7, 23, 35).  Accordingly, the provisions of the Operating

Agreement dealing with the maintenance of capital accounts were

> intended, and shall be construed, and if necessary, modified to cause the allocations
> of profits, losses, income, gain and credit . . . to have substantial economic effect
> under the Regulations promulgated under Section 704(b) of the [Internal Revenue]
> Code.

(Operating Agmt. Art. VIII ¶ 5.)

Pursuant to Treasury Regulation 1.704-1, promulgated under section 704(b) of the Code, "an allocation of income, gain, loss, or deduction," has "substantial economic effect" if "there is a reasonable possibility that the allocation (or allocations) will affect substantially the dollar amounts to be received by the partners from the partnership, independent of tax consequences," 26 C.F.R. §§ 1.704-1(b)(2)(i) & 1.704-1(b)(2)(iii), and if "the partnership agreement provides . . . [f]or the determination and maintenance of the partners' capital accounts in accordance with the rules of paragraph (b)(2)(iv) of this section . . . ."  26 C.F.R. § 1.704-1(b)(2)(ii)(b)(1).[20]

Treasury Regulation 1.704-1(b)(2)(iv) states, in relevant part, that

> the capital accounts of the partners will not be considered to be determined and maintained in accordance with the rules of this paragraph (b)(2)(iv) <u>unless adjustments to such capital accounts in respect of partnership income, gain, loss, deduction . . . are made with reference to the Federal tax treatment of such items</u> . . . .

26 C.F.R. § 1.704-1(b)(2)(iv)(n) (emphasis added).

---

[20]   Although the Robert's & Holland letter indicates that Beacon's capital accounts were "maintained in accordance with GAAP" rather than "in accordance with the rules of Treasury Regulation section 1.704(b)(2)(iv)" (Roberts & Holland Op. Ltr. at 5), the language in Beacon's Operating Agreement tracks closely that of section 1.704-1(b)(2)(iv), <u>compare</u>, <u>e.g.</u>, Operating Agmt. Art. VIII ¶¶ 1-4, <u>with</u> 26 C.F.R. § 1.704-1(b)(2)(iv)(b), and Beacon's accountants advised that the capital account balances would be "substantially equal" under either standard (Roberts & Holland Op. Ltr. at 5-6).  In this regard, Treasury Regulation 1.704-1(b)(2)(iv) provides that:

> Discrepancies between the balances in the respective capital accounts of the partners and the balances that would be in such respective capital accounts if they had been determined and maintained in accordance with this paragraph (b)(2)(iv) will not adversely affect the validity of an allocation, provided that such discrepancies are minor and are attributable to good faith error by the partnership.

26 C.F.R. § 1.704-1(b)(2)(iv)(p).

On March 17, 2009, the IRS issued Revenue Ruling 2009-9, holding that a "loss from criminal fraud or embezzlement in a transaction entered into for profit is a theft loss, not a capital loss, under §165."  2009-14 I.R.B. 735, 2009 WL 678990 (IRS RRU).  In turn, Treasury Regulation 1.165-8 mandates that:

> A loss arising from theft shall be treated under section 165(a) as sustained during the taxable year in which the taxpayer discovers the loss. Thus, a theft loss is not deductible under section 165(a) for the taxable year in which the theft actually occurs unless that is also the year in which the taxpayer discovers the loss.

26 C.F.R. § 1.165-8(a)(2) (citation omitted); see also 2009-14 I.R.B. 735 ("A theft loss in a transaction entered into for profit is deductible in the year the loss is discovered. . . .").  Moreover, Revenue Ruling 2009-9 permits the investor to "claim a theft loss deduction not only for the net amount invested, but also for the so-called 'fictitious income' that the promoter of the scheme credited to the investor's account and on which the investor reported as income on his or her tax returns for years prior to discovery of the theft."  Prepared Testimony of Doug Shulman, Commissioner, IRS, Before the Senate Finance Committee on Tax Issues: Related to Ponzi Schemes and an Update on Offshore Tax Evasion Legislation (Mar. 17, 2009), at http://www.irs.gov/newsroom/article/0,id=205374,00.html; see also 2009-14 I.R.B. 735 at *8 ("Where an amount is reported to the investor as income prior to discovery of the [fraudulent] arrangement and the investor includes that amount in gross income and reinvests this amount in the arrangement, the amount of the theft loss is increased by the purportedly reinvested amount.").

Because Beacon's Operating Agreement requires that capital accounts be maintained in accordance with Federal Treasury rules, and because the IRS has ruled that losses attributable to

22

Ponzi schemes be reported in the year they are discovered, Beacon's Operating Agreement must be read as requiring that Madoff theft losses, including those losses owing to "fictitious profits," be allocated among its members' capital accounts in proportion to their interest in Beacon as recorded in December 2008, when Madoff's fraud was discovered.

**B.      Beacon's Members Overwhelming Selected the Valuation Method**

On January 26, 2010, counsel for Beacon surveyed all members to determine which, if any, of the methodologies they preferred.  (See pages 12-13 above.)  The survey results show that an overwhelming majority of Beacon's members favor the Valuation Method.  (See page 13 above.)

According to the Operating Agreement:  "All Members . . . who have not withdrawn pursuant to Article XII hereof shall be entitled to vote on any matter submitted to a vote of the Members."  (Dkt. No. 1: Compl. Ex. A: Operating Agmt. Art. VI ¶ 1, emphasis added.)

> Unless specifically provided otherwise herein, whenever the Members are entitled to vote on any matter under . . . this Operating Agreement . . . , such matter shall be considered approved or consented to upon the receipt of the affirmative approval or consent . . . of Members whose combined Sharing Ratios aggregate at least fifty-one percent (51%) of the Sharing Ratios.

(Operating Agmt. Art. VI ¶ 2, emphasis added.)[21]

Here, the issue of which methodology should be used to allocate the Madoff losses effectively was "submitted to a vote of the Members" (see page 12-13 above) and does not involve

---

[21]      The only events which the Operating Agreement "specifically provided" for a larger majority are:  (1) "the continuation of the Company after a Dissolution Event" (75%) (Operating Agmt. Art. VI ¶ 1.1 & Art. XIV ¶ 1.1(i)); (2) the "Removal of [a] Managing Member" (75%) (Operating Agmt. Art. Art.VII ¶ 7); (3) "the election of a Managing Member to fill a vacancy" (75%) (Operating Agmt. Art. VI ¶ 1.2 & Art.VII ¶ 8); and (4) "Amendment or Modification of [the] Operating Agreement" (66%) (Operating Agmt. Art. XV ¶ 2).

any of the issues requiring a super-majority vote.  Accordingly, consent by a simple majority is all

that the Operating Agreement requires.  The result of Beacon's survey-vote shows that members

owning 51% or more of Beacon's assets (irrespective of which methodology is used to calculate the

members' interest) favor the Valuation Method.  (See page 13 above.)  Thus, by exercising the rights

provided to them by the Operating Agreement, Beacon's members have affirmed that the Fund's

remaining assets be distributed in the proportion that each member's capital account bears to all other

capital accounts, as calculated by applying the Valuation Method.  The members' selection shall be

honored.

### C.    The Cases Employing the Net Investment Method of Distribution are Inapplicable Because Beacon Itself Was Not a Ponzi Scheme

Beacon members Petronella and Tolkin assert that Beacon's remaining assets should

be distributed in accordance with the Net Investment Method, i.e., cash in less cash out.  (See pages

15-16 above.)  Petronella argues that while the Valuation Method "recognizes fictitious gains and

unfairly requires more recent investors to give up a share of their actual dollar investment to

subsidize earlier investors," the Net Investment Method "ties the value of the account to the

economic reality of the underlying transactions." (Dkt. No. 42: Petronella Br. at 8-9; see pages 15-16

above.)  According to Petronella, because of the inequity that would result from "legitimizing the

fictitious profits" (Petronella Br. at 9), the Court should follow those cases, including Judge Lifland's

opinion in the Madoff bankruptcy proceedings, In Re Bernard L. Madoff Inv. Sec. LLC, 424 B.R.

122 (Bankr. S.D.N.Y. 2010), that hold that "when a Ponzi scheme collapses, and there are

insufficient assets to repay all of the investments, the victims of the fraud should recover

proportionately in accordance with their actual losses and not their fictitious profits." (Petronella Br. at 7, 8.)

Although it may well be true, as Judge Lifland reasonably articulated, that in Ponzi scheme cases "equity and practicality favor the Net Investment method," In Re Bernard L. Madoff Inv. Sec. LLC, 424 B.R. at 140-42, the present case is distinguishable because Beacon itself was not a Ponzi scheme.

Petronella's argument that, "[b]ecause the overwhelming majority of Beacon's funds are subject to the B[LM]IS Ponzi scheme, Beacon's members are now in a similar position to those who invested directly with BLMIS" (Petronella Br. at 8; see page 16 above), is unavailing. First, unlike BLMIS, where every dollar invested was subject to Madoff's fraud, Beacon invested approximately thirty percent of its assets with legitimate managers who consistently made profits. (See page 5 above; Dkt. No. 53: H. 38-39, 71-72, 76-77.) Thus, while application of the Valuation Method allows Madoff-related "fictitious profits" to inflate member interests, application of the Net Investment Method would strip investors of legitimate gains from Beacon's significant non-Madoff investments.[22]

---

[22]    Even if Beacon's accountants were capable of netting out each members BLMIS investments while properly allocating the legitimate profits gained from other investment managers (which the Court has no way of knowing), attempting to do so would be very "time-consuming" and "expensive." (H. 76-77.) While Citrin calcualted each member's shares under the Valuation and Restatement Methods, Citrin did not recommend or calcualte member's shares under the Net Investment Method. (See pages 6-7 above.) Because Beacon has a finite amount of resources and its members have waited close to two years to receive their money, spending more investor money while tying up the funds for an indefinite period would be counterproductive.

Second, and more importantly, whereas BLMIS was subject to the Securities Investor Protection Act ("SIPA") requiring that "customers share *pro rata* in customer property to the extent of their net equities, as defined in SIPA," In Re Bernard L. Madoff Inv. Sec. LLC, 424 B.R. at 124-25, Beacon is governed by its Operating Agreement which requires that Beacon's assets be distributed in accordance with the Valuation Method. (See Section I.A above.) The Court is not aware of any legal authority that would allow it to upset this contract between and among Beacon's members, and is unpersuaded that equity demands it. See, e.g., Lanier v. Bowdoin, 282 N.Y. 32, 38 (1939) ("In the absence of prohibitory provisions of the statutes, or of rules of the common law relating to partnerships, or considerations of public policy, the partners of either a general or limited partnership, as between themselves, may include in the partnership articles any agreement they wish concerning the sharing of profits and losses, priorities of distribution on winding up of the partnership affairs and other matters. If complete, as between the partners, the agreement so made controls. The agreement here is not barred by law and furnishes a complete and legal scheme for distribution of assets and participation in profits and losses as between the partners and must control.") (citation omitted), reargument denied, 282 N.Y. 611 (1940).

## II.   JORDAN AND MCBRIDE'S CONTESTED CONTRIBUTIONS WERE FULLY INVESTED PRIOR TO DISCOVERY OF THE MADOFF FRAUD

Beacon members Jordan Group LLC and Donna McBride made substantial capital contributions to Beacon after it made its "last placement" with BLMIS in July 2008. They contend that those investments should be returned in full rather than be included in the pool of assets to be

distributed to Beacon's members.  For the reasons set forth below, Jordan and McBrides' request for relief is <u>DENIED</u>.

### A.      Additional Facts Regarding Jordan and McBride's Contributions

Beacon members Jordan and McBride also intervened in this action.  (<u>See</u> Dkt. No. 29: 3/15/10 McBride Ltr.; Dkt. No. 36: 4/30/10 Order; Dkt No. 51: Jordan Intervenor Compl.) Jordan, a member of Beacon since 2003, made a $700,000 capital contribution to Beacon on September 1, 2008.  (Jordan Intervenor Compl. ¶¶ 1-2, 40.)  McBride made a $200,000 capital contribution on December 2, 2008, which was received by Beacon on or about December 4, 2008. (3/15/10 McBride Ltr. at 1 & Ex. B: Fidelity Check Image.)[23]  Because Beacon "'made its last placement of funds with Madoff in July of 2008'" (Jordan Intervenor Compl. ¶ 46), Jordan and McBride contend that it is impossible that their late contributions were stolen by Madoff (Jordan Intervenor Compl. ¶¶ 10, 46-49; 3/15/10 McBride Ltr. Ex. C: 12/15/08 McBride Ltr.).  Accordingly, Jordan and McBride demand that their contributions be returned in full and not included in their "capital account balance for the purpose of calculating [their] respective distributive share." (Jordan

---

[23]      McBride's investment was accepted and deemed effective as of December 1, 2008.  (3/15/10 McBride Ltr. at 1 & Ex. A: 12/4/08 Beacon Ltr.)  According to McBride, her capital contribution should be returned in full because it "obviously could not have been invested before December 11, 2008 when Mr. Madoff announced the fraud."  (3/15/10 McBride Ltr at 1 & Ex. C: 12/15/08 McBride Ltr.)  Moreover, McBride argues, because Beacon's Operating Agreement "clearly states that you can only make an investment before the 1st of the month" and "[i]t is against the law for Beacon (or anyone else) to back date an investment into [an] investment account" (Dkt. No. 56: 6/2/10 McBride Ltr.), her contribution should not have been deemed effective as of December 1, 2008, and her funds should be returned. (6/2/10 McBride Ltr.; 3/15/10 McBride Ltr. at 1.)

Intervenor Compl. ¶¶ 11, 53-58 & Wherefore ¶¶ 2-3; Dkt. No. 55: Jordan Br. at 2-5; 3/15/10 McBride

Ltr. at 1.)

        According to Jordan, "Federal law is clear [that] when the wrongdoer does not take

legal possession of a client's funds, the client is entitled to a full return of those funds." (Jordan Br.

at 2-3.) Since Jordan's contribution "was effectively separated from funds which were transferred

to the legal possession of Madoff," Jordan argues, "law and equity dictate" that it not "be included

among Beacon's losses sustained by Madoff's activities." (Jordan Br. at 2-4; Jordan Intervenor

Compl. Wherefore Clause ¶ 2.) Finally, Jordan argues, Beacon's Operating Agreement "[d]oes [n]ot

[p]reclude" the return of its funds and equitable principles militate in favor of granting the requested

relief. (Jordan Br. at 5-8.)

        Beacon opposes Jordan and McBride's position that money invested after its last

placement with BLMIS should be returned. (Dkt. No. 53: H. 17-20, 24-25; Dkt. No. 58: 6/11/10

Jakoby Aff.) According to Beacon, Jordan's $700,000 contribution became effective on

September 1, 2008. (6/11/10 Jakoby Aff. ¶ 4; H. 19.) In fact, Jordan's October 21, 2008 capital

account statement reflects "that the September 1, 2008 $700,000 investment was already earning

profit just like all other pre-July 2008 investments." (6/11/10 Jakoby Aff. ¶ 20.) With respect to

McBride's December 2008 contribution, Beacon maintains that it became effective on December 1,

2008 because McBride "specifically requested that [it] be deemed effective" on that date (6/11/10

Jakoby Aff. ¶ 27; H. 18-19), and it was within Management's discretion to grant her request (6/11/10

Jakoby Aff. ¶ 26). Thus, Beacon argues, Jordan and McBride were "fully invested . . . before it was

made public that Bernard Madoff was running a Ponzi scheme" (6/11/10 Jakoby Aff. ¶ 28), and once

accepted, they became "pro rata investor[s] in all of the funds' interests" regardless of when, or whether, their capital contribution was actually invested with BLMIS (H. 17).  Accordingly, Beacon reasons, Jordan and McBride are not entitled to the requested relief but must bear their share of Beacon's loss. (6/11/10 Jakoby Aff. ¶ 28; H. 17-24.)

**B.**     **Analyses**

It is undisputed that at the time of their contested contributions, Jordan and McBride were members of Beacon.  Accordingly, determination of how to treat those contributions is controlled by the terms of Beacon's Operating Agreement.  See NCAS Realty Mgmt. Corp. v. Nat'l Corp. for Hous. P'ships, 143 F.3d 38, 45 (2d Cir. 1998) ("When a partnership agreement contains clear and unambiguous terms, New York courts enforce the plain meaning of those terms . . . ."); Furman v. Cirrito, 828 F.2d 898, 901 (2d Cir. 1987) ("The rights and obligations of partners, as between themselves, are fixed by the terms of the partnership agreement."); Greenwald v. Friedman, 147 B.R. 5, 8 (Bankr. S.D.N.Y. 1992) ("The rights and obligations of partner are fixed as between themselves, by the terms of the partnership agreement and not by the operation of law."); Lanier v. Bowdoin, 282 N.Y. 32, 38 (1939) ("If complete, as between the partners, the agreement so made controls."); Corr v. Hoffman,  256 N.Y. 254, 272 (1931) ("The rights and obligations of the partners as between themselves arise from, and are fixed by, their agreement."); Levy v. Leavitt,  257 N.Y. 461, 466 (1931) (same).

Pursuant to Article VIII of Beacon's Operating Agreement, investors receive a membership interest in Beacon in exchange for their capital contribution.  (See pages 3-5 above; Dkt. No. 1: Compl. Ex. A: Operating Agmt. Art. VIII ¶ 1; Dkt. No. 51: Jordan Intervenor Compl. Ex. 1:

Offering Mem. at 30.)   Thereafter, Beacon "establish[es] and maintain[s] [a] Capital Account[] for each Member" (Operating Agmt. Art. VIII ¶ 2; <u>see</u> page 3 above), the balance of which is "equal to [their] proportionate share of the Net Worth of the Company" (<u>see</u> page 3 above).   Existing members may "make additional investments in $25,000 increments on the first day of any month, <u>or in such other amounts or at such other times as the Managing Member, in its discretion, may determine</u>" (<u>see</u> page 4 n.5 above, emphasis added), thereby increasing their interest in Beacon (<u>see</u> page 4 above).

Once made, member contributions are pooled and collectively invested for Beacon's benefit.  (<u>See</u> page 4 above.)  Similarly, those monies not invested in securities or other financial instruments are "deposited in a bank or money market account maintained by the Managing Member . . . in the name of and for the benefit of" Beacon.  (<u>See</u> page 4 above.)  "[F]or financial and tax purposes," Beacon's profits and losses are apportioned among its members' capital accounts "in the proportion that [their] Capital Account bears to all other Capital Accounts on the last day of each applicable accounting period" (Offering Mem. at 5; <u>see</u> page 19 above), with allocated profits constituting "additional Capital Contribution[s] . . . to the Company" (<u>see</u> page 4 above).

Thus, member contributions to Beacon secure a percentage interest in Beacon's net assets and a correlative right to share proportionately in Beacon's profits and losses.  If Beacon's investments performed well, the value of each members' interest increased; if, on the other hand, the investments performed poorly, the value of their interest decreased proportionately.

It is irrelevant that particular contributions by Jordan and McBride were made after Beacon's last placement with BLMIS, and Jordan's argument that its contribution was "effectively

separated from funds which were transferred to the legal possession of Madoff" (see page 27 above) is misplaced.  Once Jordan and McBride's contributions were accepted by Beacon, the money became a Beacon asset and they received an incrementally larger "share of the Net Worth of the Company," including "all cash and cash equivalents . . . , accrued interest and the market value of all securities and other assets of" Beacon.  (See page 3 & n.4 above.)  The funds were not segregated in Jordan's and McBride's accounts, but were part of Beacon's general assets.

The cases cited by Jordan are inapposite.  In Anderson v. Stephens, government regulators filed suit against the "Futures Investment Group ('FIG')," an unregistered "commodity pool operator" that lost approximately seventy five percent of its investors' funds. Anderson v. Stephens, 875 F.2d 76, 77 (4th Cir. 1989).  Following the issuance of a court order freezing FIG's bank account, several checks were deposited into the account.  Anderson v. Stephens, 875 F.2d at 77. Rather than allow the funds to be added to other monies already in the account for purposes of a pro-rata distribution to all FIG investors, the Fourth Circuit ruled that checks deposited after the freeze order was issued should be returned in full.  Anderson v. Stephens, 875 F.2d at 78, 81.  In so ruling, the Fourth Circuit found "that the freeze order implicitly prohibited any banking activity with regard to the FIG account . . . [and] funds deposited after cessation of business rightfully can be retrieved." Anderson v. Stephens, 875 F.2d at 79-80.

In SEC v. Black, the president of a registered investment advisor (Devon Capital Management) began operating a Ponzi scheme after suffering "massive trading losses."  SEC v. Black, 163 F.3d 188, 191 (3d Cir. 1998).  Upon discovery of the fraud, the SEC obtained a temporary restraining order "whereby all assets 'presently held by [Devon], under their control or

over which they exercise actual or apparent investment of other authority' . . . were to be immediately frozen." SEC v. Black, 163 F.3d at 191-92.  Among those assets frozen by the SEC were: (1) securities held "in a pooled account in the name of [Devon] in its principal depository bank"; (2) securities held in custodial accounts at Devon's bank for the benefit of Devon's individual investors; and (3) securities held in individual investor accounts at the investors' own banks. SEC v. Black, 163 F.3d at 192.  The Third Circuit upheld a District Court order releasing funds held in the individual and custodial  accounts because none of those funds were "assets of the defendants" and the "investors themselves were [not] implicated as 'wrongdoers.'" SEC v. Black, 163 F.3d at 196. The funds in the pooled account, however, were properly frozen because "th[o]se accounts were not . . . in the names of individual investors, but, rather, were commingled funds in a pooled account . . . over which the defendants had control." SEC v. Black, 163 F.3d at 196 n.6. Importantly, the Third Circuit did not "determine claims . . . or in any way resolve disputes or final distributions among the parties." SEC v. Black, 163 F.3d at 198.

The Court fails to see the factual similarity between Anderson or Black and the present case, or how the legal principal for which those cases are purportedly offered, i.e., investors are entitled to "take a full recovery of invested funds from remaining available assets when . . . the wrongdoer never obtained legal title or possession of the . . . investment" (Jordan Br. at 2-5), applies. First, unlike Anderson, Beacon's accounts were never frozen and Jordan and McBride's capital contributions were received and accepted before discovery of the Madoff fraud.  (See pages 27-28 above.)  Second, unlike the accounts released in Black, Jordan and McBride's capital contributions

were not segregated  from other investor's funds, but were pooled and commingled in a single account held in Beacon's name.  (See pages 4, 28 above; H. 24-25.)  To the extent Jordan and McBride urge that funds never legally in Madoff's possession should be returned, it is clear that they misapprehend how Beacon operated.  The money was not in a separate account in Jordan or McBride's name, but was part of Beacon's general assets, available to pay Beacon's expenses or to pay Beacon members who were withdrawing money invested in Beacon (including invested through Beacon in Madoff).[24]

Neither does equity dictate that Jordan and McBride's late contributions be returned in full.  As was pointed out at the hearing, once accepted, each investor stood to reap the benefits of membership.  (H. 24-27.)  Accordingly, had Beacon's investments gained in value, Jordan and McBride would have benefitted from the gain, and would not now argue that their investments should not have been deemed effective until a later date.[25]

Equally unavailing is McBride's contention that Management acted improperly by retroactively accepting her investment.  (See page 26 n.23 above.)  Although McBride's contribution

---

[24]     Even as Jordan and McBride were putting money into Beacon, member Howard Siegel requested a "substantial withdrawal" from Beacon.  (H. 34.)  Siegel never received his withdrawal, however, because Beacon's Operating Agreement mandated a sixty day waiting period between a withdrawal request and dispersal, and by the time that period had ended, Management learned of Madoff's fraud and denied Siegel's request out of "fairness and equity to all the investors." (H. 34-35.)  Accordingly, it would be inequitable to side-step the terms of the Operating Agreement in favor of Jordan and McBride while simultaneously upholding the Agreement to deny the release of Siegel's funds.

[25]     Indeed, Jordan's October 2008 capital account report shows that Jordan's September contribution earned profits.  (See page 27 above.)

was dated December 2, 2008, and was not received until December 4, 2008, she specifically requested that her investment be deemed effective on December 1, 2008.  (See pages 27-28 above.) Pursuant to the terms of Beacon's Offering Memorandum, Management had the authority to accept McBride's contribution on the "first day of [the] month, or at such other time as the Managing Member, in its discretion, may determine" (see page 3 n.3 above, emphasis added), and decided to exercise its discretion to accommodate McBride's request (see pages 27-28 above; H. 18-19, 36-37; 6/11/10 Jacoby Aff. ¶ 27). While the Offering Memorandum also states that no investment will be effective until the contribution is "credited to the Company's account" (Offering Memo, at 8, 31), McBride's own records show that the funds were withdrawn from her bank account on December 5, 2008, before discovery of Madoff's Ponzi scheme.  (See Dkt. No. 29: 3/15/10 McBride Ltr. Ex. B: Fidelity Check Image.)

   For the reasons stated above, Jordan and McBride's requests are DENIED, and their capital contributions, dated as of September 1, 2008 and December 1, 2008 respectively, shall be included in the assets to be distributed amongst Beacon's remaining members.

## CONCLUSION

   For the reasons stated above, the Fastenberg Intervenors' motion is GRANTED.  A mandatory injunction is granted directing Beacon's Management to distribute, by August 31, 2010, Beacon's remaining assets, including Jordan and McBride's contested contributions, in accordance with the Valuation Method (i.e., in the proportion that each member's capital account bears to all other capital accounts, as stated in Beacon's books as of December 2008).  Management, however,

is ordered to maintain the previously established litigation reserve; to withhold an amount sufficient to cover the claims asserted against Beacon by the Madoff Trustee; and to refrain from distributing any monies to either Managing Member, Joel Danziger or Harris Markhoff, until further Court order.

SO ORDERED.

DATED:      New York, New York
            July 27, 2010

_____
Andrew J. Peck
United States Magistrate Judge

Copies to:   Tab K. Rosenfeld, Esq.
             Robert G. Morvillo, Esq.
             Arthur G. Jakoby, Esq.
             Max Folkenflik, Esq.
             Michael S. Re, Esq.
             Leonard A. Rodes, Esq.
             Kimber Parker Schladweiler, Esq
             Thomas M. Skelton, Esq.
             Donna McBride

H:\OPIN\BEACON